## Case No. 14,519.

### UNITED STATES v. BARKER.

### [1 U. S. Law J. 1.]

District Court, S. D. New York. June, 1822.

BILLS OF EXCHANGE — TIME FOR PRESENTMENT — PROTEST AND NOTICE.

[1. A bill of exchange, payable at sight, must be presented within a reasonable time. Due diligence must be used, but there is no necessity for such dispatch in forwarding a bill for acceptance as in giving notice of dishonor; and in the case of a foreign bill it is not necessary to send it by the first vessel that sails for the country where the drawee resides.]

[2. In determining whether a bill purchased by the government has been forwarded by it for acceptance, and whether notices of dishonor have been transmitted by it in proper time, some allowance may be made for the situation of the capital, and some indulgence extended to the useful and proper forms, if not to the supercilious ceremonies of public officers.]

[3. In giving notice of dishonor due diligence must not only have been used, but must be affirmatively shown to have been used.]

[4. It is now settled that after the facts of time, distance of the parties, course of the post, etc., are found by the jury, it is the province of the court to determine whether due diligence has been used in giving notice of dishonor.]

[5. Where there was a delay of nine days between the protest of a bill for nonacceptance and the first attempt to transmit notice thereof from England to America, held, that such delay ought to have been explained, and, in the absence of an explanation, was fatal.]

[6. If there is a regular post between two countries, which is the proper channel for transmitting notice of dishonor, it must be proved not only that notice was put in that course of transmission, but that it was done in time for the next practicable post. Mere belief of a witness that this was done is not sufficient evidence thereof.]

[7. A notice through the post office is only effectual where there is a regular post. Where it is known to have ceased, or where it is notoriously interrupted by reason of war or otherwise, the post is not the proper legal medium for transmitting notice. The fact of the existence of war between the two countries does not obviate the necessity for at least making an attempt to give notice by means of a licensed vessel, etc., or by transmission through another country with which both belligerents are at peace.]

[8. Whenever the holder of a bill becomes aware of its dishonor, he is bound to transmit notice thereof, even though the protest has not yet been received by him. If the protest is received, it is proper to forward it, but notice may be given without it.]

[9. Where a protest for nonacceptance and a protest for nonpayment were both received at the same time, held, that transmission of notice of the nonpayment alone was not sufficient. A protest for nonpayment can never supply the place of a protest for nonacceptance, where the bill has been presented.]

[10. Where notices of dishonor of a bill of exchange were in the hands of the secretary of the treasury on the 7th, and he wrote a letter, inclosing the notices, on the 8th, which could only be placed in the mail of the 9th, held, that this was sufficient, in view of the delays incident to governmental business, but that transmission by the mail of the 10th would have been too late.]

[11. Where notices of dishonor are transmitted through agents, the time for giving notice cannot be extended by giving an additional day to each agent. The notice must be transmitted within the time allowed to the principal.]

C. Baldwin and R. Tillotson, Dist. Atty., for United States.

T. A. Emmet, J. Wells, and J. O. Hoffman, for defendant.

VAN NESS, District Judge. This suit is brought on a bill of exchange for £5,000 sterling, dated 7th Mo. 30th, 1814, sold by the defendant to the plaintiffs. It was drawn on Thomas R. Hazard & Co., of Liverpool, and made payable to John Slidell; by him endorsed to Thomas T. Tucker, treasurer of the U. S., and by him endorsed, as treasurer, and the contents ordered to be paid to Messrs. Barings Brothers & Co. This bill among others, was purchased in New York, by Samuel Flewwelling, by order of the secretary of the treasury, to whom it was transmitted by Mr. Flewwelling. It was registered in the treasury department, on the 8th of August, 1814, and forwarded to Messrs. Barings & Co., London, in September, 1814. It was presented for acceptance, and protested for non-acceptance, the 28th November, 1814. It was presented for payment, and protested for nonpayment, on the 30th January, 1815. Notice of the protest for non-acceptance was received at Washington on the 7th May, 1815. But no notice of the non-acceptance of the bill was ever given to the drawer, either by the agents in England, or by the treasury of the United States. The secretary of the treasury was also in possession of the notice and the protest for non-payment on the 7th May. How or when it was received, we are left to conjecture. Throughout the argument, however, it has been taken for granted that it arrived by the same conveyance which brought the notice of non-acceptance. The notice and protests for non-payment were forwarded to Mr. Flewwelling, of this place, in a letter from the secretary of the treasury, dated the 8th May, 1815; and the notice served here, through the agency of a notary public, on the 12th.

On these facts, a defence has been set up, consisting of several points. The objections to the form of the declaration are overruled, and the testimony of Mr. Jones, and the written memorandum of Mr Bleecker, as far as they are material to the issue, are deemed admissible. The discussion of the points presenting these objections will be found in the opinion I have in part prepared in this case. With a view, however, to its present decision, I propose now to state the result of my deliberations on the 2d, 5th, and 6th points, which were made by the defendant's counsel, and are as follows: 2d. "There was an unreasonable delay in forwarding the bills to England for acceptance." 5th. "No notice was ever given the defendant of the protest of the bill for non-acceptance, nor is the omission to do so legally accounted for." 6th. "Notice was not given to the defendant of the protest for non-payment, the evidence of Mr. Tillon

respecting Mr. Bleecker being inadmissible, and if it was admissible, still due diligence was not used in giving such notice."

In the investigation of this case, I have felt myself oppressed, not more by its importance, than by the variety and extent of the decisions and legal learning, by which the law that governs it has been developed and its principles enforced. The rules contended for, in this case, seemed to me rigorous, and I entered upon the examination with a disposition to mitigate their severity, as far as that could be legally and safely done. But whether the rigor, with which they have been uniformly applied, be wise or expedient, is a question not now to be determined. Whatever they are, they must receive a fair and legitimate application. They rest upon the experience of too many years, and upon decisions too numerous and grave, to be now disturbed. The law relative to bills of exchange, has progressively varied with the increase of commerce. The extent to which these instruments have been used, and the infinite variety of purposes, real and fictitious, to which they have been applied, has rendered it necessary and important, that the law regulating their use should be established and defined with all practicable precision, and that the rules, fixing the liabilities of the respective parties, should be inflexibly enforced. Although this mercantile invention of modern times (for it is comparatively modern) is attended with peculiar convenience, it is also subject to rigid and established disadvantages. Of these, all parties who deal in instruments of this sort are presumed to be apprized, and to acquiesce in the inconveniences and hazards connected with the transaction.

The general rules, by which the holder of a bill should be governed, are these. They have been collected with some care, and, though concisely, are, as I conceive, now correctly stated:

1st. When a bill is drawn, payable at sight, or a certain number of days thereafter, it is necessary, to present it for acceptance, that the time of payment may be fixed.

2dly. When it is presented, and acceptance refused, notice of the dishonor must be given to all the parties to whom the holder means to look for payment.

3dly. That notice, if the parties reside in the same place, must be given, at farthest, by the expiration of the day succeeding the dishonor.

4th. If elsewhere, though within the same country, by the next post, unless some peculiar difficulty or inconvenience should interpose; and, in that case, it may be given by the second post. If there be no post, then by the next ordinary conveyance. Whatever may be the difficulty that intervenes and produces delay, whether sudden illness, death, or other accident, the notice must be given as soon as possible after the impediment is removed.

5th. If the party to whom notice is to be given, resides in a foreign country, it may be sent by the post, if there be one; if not by the ordinary mode of conveyance, or by the first ship, bound to the place to which it is to be sent. In every case, due diligence is to be used. What shall be deemed due diligence, must necessarily depend upon the circumstances of every case.

The first point I propose to examine is, whether the bill in question was presented for acceptance in due time. Bills payable after sight must necessarily always be presented for acceptance; but when, is a question left very loose by the cases, and from the nature of it, the time cannot be fixed or prescribed with much precision. The only rule which can be laid down is that due diligence must be used. It may, in some instances, be useful and important to the drawer, that the bill should be presented as soon as possible. He may entertain doubts as to the safety of his funds in the hands of the drawee, and may wish to withdraw them without delay. In this view of the subject, and in the protection of the interest of the drawer, neither the payee nor any subsequent holder is authorized by the law merchant to lock up a bill, payable after sight, or to keep it quietly in his possession, for any great length of time. I cannot, however, accede to the suggestion that it is necessary, if it be a foreign bill, to send it by the first vessel that sails for the country on which it is drawn. There is not so much necessity for dispatch in forwarding a bill for acceptance, as in giving notice of its dishonor. Yet the drawer and the parties have a right to require that it should be presented within a reasonable time.

A distinction is taken in the books, between bills put in circulation, and such as continue to be held by the payee, or original endorsee. If the bill be sent into circulation, it is said that it may be kept out, and the day of payment thus postponed, for an indefinite period. If not, that it must be presented with due diligence for acceptance. I must confess that this appears to me an arbitrary distinction, the reason and justice of which I do not fully comprehend. The policy of it probably is to advance the general interest of trade by encouraging the negotiability of these instruments, and promoting the transfer of this fictitious sort of capital. But it is incompatible with the reasons, and subversive of the principle upon which diligence is demanded of the original holder. The rule on this point, as far as it is settled by the English courts, may be found in Mulman v. D'Equino, 2 H. Bl. 565; Goupy v. Harden, 7 Taunt. 159, 162; Fry v. Hill, Id. 397. In the first case, Buller says: "The only rule I know of which can be applied to the case of bills of exchange, is, that due diligence must be used. Due diligence is the only thing to be looked at, whether the bill be foreign or inland; or whether it be payable at sight, or at so many days after, or any other manner.

But I think a rule may be thus far laid down as to laches with regard to bills payable at sight, or a certain time after sight, namely, that they ought to be put in circulation; and, if a bill drawn at three days after sight, were kept out in that way for a year, I cannot say that there would be laches; but if, instead of putting it in circulation, the holder were to lock it up for any length of time, I should say that he would be guilty of laches; but, further than this, no rule can be laid down." The bill was not put in circulation, nor, as I conceive, was it locked up for any length of time.

There are many circumstances connected with the movements and negotiations of the government which must necessarily be productive of delay. Some allowance must be made for the interior situation of the capital, and some indulgence extended to the useful and proper forms, if not to the supercilious ceremonies of public officers. Bills for the government must be bought at a remote commercial city; transmitted to Washington; registered according to form and custom, at the treasury; sent again to a seaport, and forwarded thence through the medium of an agent. These various processes consume some time.

There are some incidents, too, peculiar to this case. We know historically, that our public functionaries, and their offices, were somewhat deranged during the time this bill was in their possession; it was brought here the 30th of July, passed through all the requisite formalities, and dispatched for England, as Mr. Jones states, in August or September. Amidst the untoward events of that memorable period, and the admitted interruption in the intercourse between this country and England, a liberal time shall be allowed for the transmission of the bill; and I am of opinion, under all the circumstances of the case, that there has been due and reasonable diligence in presenting it for acceptance.

I have already stated the general rules to be observed in giving notice of the dishonor of a bill. They afford some explanation of the sense in which the terms "due diligence" are used in their application to different cases. They mean according to the circumstances, the next day, the next port, or the next ship, bound for the place to which the notice is to be sent. But, in all cases, due diligence in giving notice must not only be used, but must be proved to have been used. Whether it be sent in one way or another, or at what time, if the want of it be set up, are facts which must be proved, that the court may be enabled to determine, whether the notice has been given in a reasonable time. For it is now settled, although once much disputed, that the facts of time, distance of the parties, course of the post, &c., being found by the jury, it is the province of the court to determine whether due diligence has been used in giving notice.

When this cause was first brought before me, in 1816 [case unreported], the plaintiffs relied for their recovery on their protest and notice of nonpayment alone. It being a bill payable sixty days after sight, and a presentation for acceptance indispensable, I decided that the presentment be shown, and if acceptance had been refused, that the protests and due notice of the dishonor should be proved, or its omission legally explained and accounted for. Although it was made in the hurry and progress of the trial, I am, on a full examination of the case, well satisfied with that decision. It put an end to the further progress of the cause on the testimony then produced. With a view, however, to preserve the remedy of the United States, and to enable them, if possible, to supply the evidence I had pronounced indispensable, I gave it a direction which afforded them an opportunity to apply for a commission to examine the agents of the United States, in London. It was issued, and has been duly executed and returned. In order to apply the rules I have laid down, to the case as now before me, it is necesssary to examine the testimony which has been obtained.

The bill, it appears, was presented for acceptance, and protested for non-acceptance, on the 28th November, 1814. In the answer of Swinton Cotthnut Holland, Esquire, to the fourth interrogatory propounded to him, the measures taken to transmit the protests and notice of non-acceptance to the treasurer of the United States, are thus stated: "The protests, for the non-acceptance of the said bills, were all forwarded to the treasurer of the United States, enclosed in one letter to him, dated the 9th day of December, 1814, and sent, as he, this deponent, believes, through the medium of the post office, but by what vessel, they have no memorandum." This, in the first place, discloses a delay of eleven days, between the protest of the bill and the first attempt to transmit notice of that fact. Between two and three were employed in its transmission from Liverpool to London, leaving still eight. Although this, itself, under special circumstances, and an extraordinary state of things, might not be fatal; yet it is a delay that ought to have been explained. Upon general principles, whenever the law imposes a duty, its omission or nonperformance is necessarily open to animadversion. The law relating to bills of exchange is composed of arbitrary, positive and rigid rules, and a departure from their injunctions must always be explained. It is settled law, laid down by the elementary writers, and maintained by the decisions of the courts, "that in the case of a foreign bill notice should be given on the day of the refusal to accept, if any post or ordinary conveyance sets out that day, and if not, by the next earliest ordinary conveyance." Chit. Bills. 291; Leftley v. Mills, 4 Term R. 174; Ld. Raym. 743; Coleman v. Sayer, 2 Strange, 828; Mar. 97; Muilman v. D'Equino, 2 H.

Bl. 565. Hence. after so material a delay, it would seem necessary to show that the next post or ordinary conveyance was not lost.

It is, perhaps, not very important, though, in a minute examination of the evidence, it may be worthy of remark, that the letter in which the protests are alleged to have been forwarded, is said to have been "dated" on the 9th of December. When it was written, which may have been at a period long subsequent, is not stated. I am very far from intending to impute to these respectable agents any unworthy evasion of this sort, and I only notice the circumstance to show the general want of accuracy and precision which pervades the evidence before me. The protests were forwarded, as the deponent states, in a letter of that date; "and sent, as he believes, through the medium of the post office, but by what vessel, they have no memorandum." Nothing, in all the law relative to bills of exchange, is better settled, or more firmly established, than that, if the post be relied on as the mode of conveyance, the sending must be strictly and affirmatively proved. The sending must not only be thus proved, but the time when. How else can it be determined whether due notice was given? If the party to be charged is legally entitled to notice by the next post, or next ordinary conveyance, how can we ascertain whether the law has been satisfied, unless the time when, and the manner in which it was sent, be shown? I hold it now too clear to admit of either doubt or argument, that the holder must show notice was sent in proper time, and in a proper manner. It was once holden, to be sure, that delay in giving notice did not discharge the party insisting on it, unless he could prove that he had sustained damage by the laches of the holder. Mogadore v. Holt, 1 Show. 318; Butler v. Play, 1 Mod. 27; 12 Mod. 15; Sarsefield v. Witherly, Comb. 152; Bickerdike v. Bollman, 1 Term R. 406; Vin. Abr. tit. "Bills of Exchange." Poth, pl. 157, 8; Postl. Dict. tit. "Bills of Exchange," 16, 17; Whitfield v. Savage. 2 Bos. & P. 280. 281. But that doctrine was definitely overruled in the case of Dennis v. Morrice. 3 Esp. 158. Such damages are to be presumed, unless it be shown that the drawer has no effects in the hands of the drawee. In all other cases, it lies upon the plaintiffs to prove that due notice was given. In the language of a high authority, "The holder must prove that notice was given, in due time, to the party he sues, and it cannot be left to inference without positive proof. This, therefore, is one of the most important branches of the law respecting bills."

That the time when the notice was sent must be proved with precision, if it be material, to show the fact of due diligence, is, independent of the nature of the transaction, very clearly set forth in the case of Lawson v. Sherwood [Chit. Bills, 959], in which the witness stated: "That either two or three days after the dishonor of the bill, notice was given by letter to the defendant, notice in two days being in time, but on the third too late." Per Lord Ellenborough: "The witness says two or three days, the third would be too late. It lies upon the plaintiff to show that notice was given in due time, and I cannot go on probable evidence, without positive proof of the fact, nor can I infer due notice from the non-production of the letter. The onus probandi lies upon the plaintiff, and since he has not proved due notice, he must be non-suited."

Admitting, then, for a moment, that there was a regular post between that country and this, and that, in this case, the post office was the proper channel through which to transmit the notice, it ought to have been clearly and explicitly proved, not only that it was put in that course of transmission, but that it was done in time for the next practicable post; or, in other words, within the time required in the case of bills of exchange. The belief merely of the witness can in no case be received as evidence of these facts. So rigid and inflexible is the rule of law on this point that in the most approved work, and highest authority, we have on this subject, it is laid down that, "when notice is to be sent from London, by the general post, the letter containing it should be put into the post office in Lombard street or at a receiving house, and that the delivery to a bell-man in the street is not sufficient; and that this should, in all cases, be done by a person who will afterwards be competent to prove it."

I am clear that the general belief of the witness, unexplained and unsupported by a disclosure of the circumstances on which it is founded, that the letter in question was "sent through the medium of the post office," must be rejected as totally insufficient. It is the more incompetent, as the time when it was sent is, in no way, indicated. It may have been weeks, or months, after the date. Many mails may have been lost, and many vessels may have intermediately sailed for the United States. We have nothing by which to judge of the fact of due diligence. The proof that the protest and notice were put in the post office having, in my judgment, totally failed, it seems unnecessary to pursue this branch of the subject farther. But the question whether the post office was in this case, the proper repository for these documents, deserves a moment's consideration.

It has been earnestly contended that it was; and the argument. to be useful or effectual, must be understood to mean that, whether in peace or in war, whether the post has notoriously ceased or been interrupted, whether, in point of fact, there be a regular post or not, yet notice of the dishonor of a bill may be placed in the post office. I do not so understand the law. On the contrary. I am clearly of opinion that, in each of the cases I have enumerated, the notice would be insufficient. and the party for whom it was intended discharged from his liability. A no-

tice through the post office is only effectual where there is a regular post. Where it is known to have ceased, or where it is notoriously interrupted, the post office is not, I conceive, the proper or legal medium, through which the party may attempt to convey it.

But there was war, it is said, between the two nations; no intercourse was allowed, and, therefore, no notice could be given. If so, all would be well. The law required no impossibilities. It only requires due and reasonable diligence. If, when the communication by mail was known to be suspended or interrupted, a reasonable effort had been made to forward the notice, though unsuccessful, and that fact had been made to appear, it would have operated in excuse of the omission. But it is not attempted to be shown, nor even pretended, that a licensed vessel or any other opportunity was sought for. We all know that cartels occasionally passed between the two countries, and it appears to me that the expedient of sending the dispatch through a neutral country might rationally have presented itself to the minds of the agents. It was known that the communication between England and France, and France and America, was easy, constant, and rapid. Any expenses that might have been incurred by a resort to unusual means could have been recovered in this action, because recourse to unusual means, when the ordinary mode of conveyance fails, is most clearly and obviously required. Peace was made between the two countries on the 28th December. The Favorite left England with the treaty the 2d January; yet it is not pretended that duplicate notices were sent by that conveyance or by any other, although the intercourse was restored so soon after the dishonor of all these bills.

These remarks have been made more to meet some of the arguments thrown out on the trial of this cause, than to show a want of diligence in the agents of the United States; for there is no adequate evidence to prove that they had recourse to any means, either ordinary or extraordinary, to transmit the protest and notice. Their vague and general belief, I have already said, is incompetent to establish legally the fact that they were sent through the medium of the post office. It is not alleged, nor even suggested, that other means were attempted. Under what views of their duty they acted, it is impossible to determine, and useless to inquire, —certainly none that we are able to draw from the proceedings in the legal tribunals of their country.

As no justification or excuse for the omission to give due notice of the non-acceptance of this bill can be derived from the proceedings in England, it may be proper to consider the reasons assigned for not transmitting it, when it ultimately reached the treasury of the United States. Mr. Jones, in his deposition, states that advice of the non-acceptance of this bill reached Washington the 7th May, 1815, more than five months after it had been protested, and that notice was not and could not be given to the drawer, because the protest was not received. This was the unfortunate error; for it is clear that the protest was not necessary to enable him to give the notice; and it is equally clear that it was his duty to do so, whether the protest was received or not. Whenever the fact of dishonor of a bill becomes known to the holder, he is bound to communicate it, with due diligence, to the parties to whom he means to resort for payment. If the protest be received, it is proper to forward it, but the notice may be given without it.

It appears that notice of the protest for non-acceptance, and the protest for non-payment, were received simultaneously; and it is contended, that the latter superseded the necessity of giving notice of the former. I cannot conceive where that inference is drawn, or how that result can follow. A protest for non-payment can never supply the place of a protest for non-acceptance, where the bill has been presented. But a protest for non-acceptance supersedes the necessity of a protest for non-payment, and a notice of the second dishonor is perfectly gratuitous. But notice of the first dishonor must invariably be given. Accident and many circumstances may excuse delay in giving it, but nothing can excuse a total omission, if received. It is of importance often to the parties, to know that the regular steps were taken previous to the protest for non-payment. That the notice of non-acceptance was received late, forms no excuse for withholding it still longer; for no party can do more than give it, when received, and, although there may have been antecedent laches, he is not to assume the province of deciding on their effect. If he does, he hazards his remedy, and must submit to the legal consequences of his presumption. Whether we look at the proceedings of the agents in England, or of the principals at Washington, there has been an irregularity and want of diligence, in giving notice of the presentment and protest for non-acceptance of this bill, that must, in my judgment, upon the evidence as it now stands, preclude a recovery upon it.

This is perhaps all that this court is at present required to decide; but as the notice of the protest for non-payment forms an important feature in this case, and has been relied on, at one time, exclusively, to maintain the action, and its regularity throughout contended for, it is worthy of some attention. It appears that the government, or rather the treasury, was also, on the 7th of May, in possession of a letter giving advice of the protest of this bill for non-payment. How or when it was received, we are left to conjecture. It is contended by the plaintiff's counsel that the notice of non-payment ought to have been sent by the next day's mail, which was not done; as the letter of the secretary, directing Mr. Flewwelling to cause no-

tice to be given, is dated on the 8th, and it is known that the mail closes too early in the morning to take a letter dated on the same day. I think, however, it would be holding the government to too rigid a rule, to require its officers to send notices to the post office the same day it is received, or even by sunrise the next. If, therefore, the letter written by the secretary on the 8th had been sent by the mail of the 9th, and notice given immediately on its receipt here, there would have been, in my opinion, due diligence in giving notice of non-payment. As the dilatory forms of public officers would probably entitle the government to indulgence, until the departure of the second mail after the notice of the protest was received, yet a farther delay would be inevitably fatal, unless a proper and sufficient cause for the omission were shown. That it should have been sent by the next mail after its receipt, is the general rule. And, in a transaction that occurred between individuals in the District of Columbia, the supreme court of the United States have so decided. In the case of Lenox v. Roberts, 2 Wheat. [15 U. S.] 373, the chief justice says: "Notice of the default of the maker should be put in the post office early enough to be sent by the mail of the succeeding day." In the absence of all proof, as to the time when the secretary's letter was dispatched, and of its receipt in New York, and presuming that the notary here did his duty, by giving notice the day he received orders to do so, it would seem that the letter in question did not leave Washington till the morning of the 10th, which was too late. The mail which left Washington on that day, in its ordinary course, it is admitted, must have arrived here early in the morning of the 12th. Mr. Flewwelling swore that, in that case, he must have received the notice by half past ten o'clock: that he handed it to the notary without delay, with instructions to give the notices immediately. From the testimony of Mr. Flewwelling, it is evident that he was duly impressed with the importance of the transaction; that he lost no time himself; and that he urged the notary to diligence and promptitude. From all these circumstances, it is fair to infer that the notice was given here the day that it was received.

It must be remarked in this place, as was done, on high authority, when treating of the notice of non-acceptance, that as to the notice of the dishonor of a bill, the court is not to be left to draw inferences, or to weigh probabilities. Due notice must be proved. The notice was received by the secretary as early as the 7th. It was forwarded, as is admitted, on the 9th or on the 10th. The 9th was, perhaps, the time; the 10th certainly too late. This is in all respects, within the case of Lawson v. Sherwood, Chit. Bills, 959, and 1 Starkie, 314; and shows conclusively that it was indispensably necessary for the plaintiffs to furnish proof of

the day on which the notice left Washington. It is laid down by Lord Ellenborough, in the case of Langdon v. Hulls, Chit. Bills, 697, and 5 Esp. 156: "That notice of the dishonor of bill, by letter, was certainly good evidence, and had been so decided; but that there were other circumstances, besides the mere fact of notice, which were necessary to give effect to it, so as to entitle the plaintiffs to recover. These were the date, and the time when it was sent, which were material, for notice of the dishonor was not sufficient, unless given in the time required in the case of bills of exchange." If, then, the 10th was too late, it ought in some way to have been shown that it was sent before. It is not on the defendant to prove the negative, and show that it was not sent before the 10th. The court cannot infer that it was sent in time, from the simple circumstances of the date of the letter, and it is very obviously the duty of the plaintiff to prove it. This has not been done; and if the case turned upon this single point, I do not see how it could be sustained. All that is proved, in the case before me, is, that the secretary was in possession of the notice on the 7th; that he wrote a letter to Mr. Flewwelling dated on the 8th, directing notice to be given here; and that notice was so given on the 12th, being five days after it is known to have been in the possession of the secretary. In the absence of all explanation, the sufficiency and regularity of this notice may well be questioned.

It has been contended that the notary here was entitled to a day to give the notice. It might be entitled to very grave consideration in this case, if it were proved that he took a day; but it is not. When the question was first raised, I was disposed to acquiesce in the suggestion. I was led into the opinion by the general rule which entitles each party to a day to give notice to the one before him. The rule, however, I am well persuaded, is, and must be confined to the parties to the bill. Each party has from one day to the next to give notice, but he cannot multiply the days, or extend the time by the employment of an agent. If he could, it would render the time for giving notice perfectly indefinite, and lead to great irregularity and inconvenience. The case of Bancroft v. Hall [Holt, N. P. 476], clearly shows, that notice given through the medium of an agent, must be within the time allowed the principal. The circumstances being known, the time is fixed within which the notice must be given, either by the principal or his agent. Here two agents were employed: 1st, Mr. Flewwelling; and 2d, Mr. Bleecher; incurring hazards and delays at every step. Every danger would have been avoided, if the secretary had sent one of his clerks, in due season, with notices to the post office in Washington. They would have been perfectly sufficient and effectual.

If, then, the agent is bound to serve the notice within the time allowed the principal,

or on some other day, the ordinary conveyance would have brought it, and if due notice must be proved, there are two defective links in the chain of this testimony, relative to the notice of non-payment: 1st, As to the time the letter was sent from Washington; and, 2d, as to the day on which the notice was received and served here. If five days between the reception of the notice at Washington, and the service here, be too much, and strict proof of due notice be necessary, the plaintiffs have failed to make it out, or to explain the delay.

All the subordinate points presented by the case will be found discussed in their proper place, and will be furnished to those interested in the result.